## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARWAH AL IHSAN AL-GHARAWY,
*et al.,*

    *Plaintiffs*,

  v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

    *Defendants*.

Civil Action No. 21-1521 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Marwah Al Ihsan Al-Gharawy, a U.S. citizen, and her parents, Bushra Hamza Al-Kaabi and Ihsan Hadi Al-Gharawy, both Iraqi citizens, bring this action under the Administrative Procedure Act, 5 U.S.C. § 706(1), and the Mandamus Act, 28 U.S.C. § 1361, to compel Defendants—various departments and officers of the United States—to adjudicate the immigrant visa applications of Bushra Hamza Al-Kaabi and Ihsan Hadi Al-Gharawy, which have been pending for over eight years.  Dkt. 1 (Compl.).  Plaintiffs argue that Defendants have unreasonably delayed adjudicating their applications and have thereby violated the APA, 5 U.S.C. § 555(b), and the Due Process Clause of the Fifth Amendment.  Defendants have moved to dismiss a subset of Defendants for lack of standing and the case as a whole for failure to state a claim.  Dkt. 8.

For the reasons that follow, the Court will **GRANT** in part and **DENY** in part Defendants' motion.

# I.  BACKGROUND

## A.  Factual Background

The following factual allegations are taken from Plaintiffs' complaint, which the Court accepts as true for the purposes of Defendants' motion to dismiss.  *See Harris v. D.C. Water & Sewer Auth.*, 792 F.3d 65, 67 (D.C. Cir. 2015); *Fragola v. Kenific Grp., Inc.*, No. 21-cv-1423, 2022 WL 1908824, at *1 (D.D.C. June 3, 2022).

On January 24, 2013, Marwah Al Ihsan Al-Gharawy, who is a U.S. citizen, submitted Form I-130 (an Alien Relative Petition) to U.S. Citizenship and Immigration Services ("USCIS") on behalf of her parents, Bushra Hamza Al-Kaabi and Ihsan Hadi Al-Gharawy, who are Iraqi citizens.  Dkt. 1 at 4, 6 (Compl. ¶¶ 2–3, 16).  USCIS approved Plaintiffs' visa petition in August 2013 and forwarded it to the National Visa Center ("NVC"), a division of the State Department, for additional processing.  *Id.* at 6 (Compl. ¶ 17).  Bushra Hamza Al-Kaabi submitted Form DS-260 (Application for Immigrant Visa and Alien Registration) to the NVC on August 18, 2013, and Ihsan Hadi Al-Gharawy submitted the same form on November 20, 2015.  *Id.* (Compl. ¶ 18).  On October 3, 2016, Bushra Hamza Al-Kaabi and Ihsan Hadi Al-Gharawy interviewed with a consular official at the U.S. Embassy in Baghdad.  *Id.* at 7 (Compl. ¶ 20).  At that interview, the two were handed a "visa refusal sheet," which advised them that their "immigrant visa application needs further administrative processing."  *Id.*  Embassy officials retained Plaintiffs' passports, which Plaintiffs were advised would be returned "once the administrative processing was completed and their visas issued" so that the visas could be "placed on their respective passports."  *Id.*[1]

---

[1] At Plaintiffs' request, the Embassy later returned Plaintiffs' passports to enable them to travel internationally while their applications remained pending.  Dkt. 1 at 7 n.2 (Compl.).

Over the ensuing eight years, Plaintiffs made several inquiries into the status of their applications, to no avail. *Id.* (Compl. ¶ 21). Plaintiffs last contacted the U.S. Embassy in Baghdad on April 12, 2021. *Id.* at 8 (Compl. ¶ 23). In response, the Embassy informed Plaintiffs:

> As of today, your case is refused under section 221(g) of the Immigration and Nationality Act for administrative processing only. At this time, no further action is required on your part. We are unable to give an estimate as to when the processing of this case will be completed as the outcome of each case is individually determined. The visa application will be reviewed when administrative processing is complete, at which time we will reach out directly.

*Id.* at 8–9 (Compl. ¶ 23). The Embassy further advised Plaintiffs that "[a]s of January 1, 2020, all public consular services are suspended at the U.S. Embassy in Baghdad, Iraq." *Id.* Initially, the pause on operations was caused by an attack that occurred on the facility, *see Visas*, U.S. Embassy & Consulates in Iraq, https://iq.usembassy.gov/visas (last accessed July 27, 2022), but the Embassy further explained that, since March 2020, "routine visa services [had been] suspended worldwide due to the COVID-19 pandemic," Dkt. 1 at 8 (Compl. ¶ 23). Although a "phased resumption of routine visa services" began in some embassies across the globe "[i]n July 2020," the Embassy caveated that "[t]he resumption of routine visa services . . . will occur on a post-by-post basis, consistent with the Department's guidance for safely returning our workforce to Department facilities" and that the "volume and type of visa cases each post will process" will "depend on local circumstances." *Id.* The Embassy encouraged Plaintiffs to "continue to monitor the Embassy and Consulate websites at https://iq.usembassy.gov/ to see when [the Embassy is] able to return to normal operations." *Id.* at 9 (Compl. ¶ 23). As of the date of this opinion, visa services in Baghdad remained suspended. *See Visas*, U.S. Embassy & Consulates in Iraq, https://iq.usembassy.gov/visas (last accessed July 27, 2022).

B.      **Procedural Background**

Plaintiffs commenced this action on June 4, 2021, naming the Department of Homeland Security ("DHS"), the Secretary of DHS, USCIS, the Director of USCIS, the State Department, the Secretary of State, the U.S. Embassy in Baghdad, and the U.S. Ambassador to Iraq as Defendants.  Dkt. 1 (Compl.).  Plaintiffs allege that Defendants' "failure to complete administrative processing" violates "their legal duty to avoid unreasonable delays" under Section 555(b) of the Administrative Procedure Act, *id.* at 12 (Compl. ¶ 41); *see id.* at 10 (Compl. ¶ 30), and violates a Fifth Amendment due process right to fundamental fairness in administrative adjudication, *id.* at 13 (Compl. ¶¶ 44–45).  Accordingly, Plaintiffs ask the Court to compel Defendants promptly to complete all administrative processing within sixty days.  *Id.* at 14 (Compl.).

On August 27, 2021, Defendants moved to dismiss several Defendants for lack of jurisdiction and the complaint as a whole for failure to state a claim.  Dkt. 8.  On October 15, 2021, Plaintiffs opposed the motion in full, which is now fully briefed.

## II.  LEGAL STANDARD

Because "defect[s] of standing" constitute "defect[s] in subject matter jurisdiction," *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987), a challenge to standing is properly raised on a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(1).  At the motion to dismiss stage, a challenge to the plaintiff's standing "may take one of two forms."  *Hale v. United States*, No. 13-cv-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015).  First, a Rule 12(b)(1) motion "may raise a 'facial' challenge to the Court's jurisdiction."  *Id.*  A facial challenge asks whether the complaint alleges facts sufficient to establish the court's jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see also Owner-Operator Indep.*

*Drivers Ass'n Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339, 346–47 (D.C. Cir. 2018).  To survive a motion to dismiss, the plaintiff must plausibly allege the "three elements" that comprise the "irreducible constitutional minimum of standing": injury in fact, causality, and redressability. *Lujan*, 504 U.S. at 560–61.  That is, the plaintiff must plausibly allege (1) a "concrete," "particularized," and "actual or imminent" "invasion of a legally protected interest" that is (2) "fairly traceable to the challenged action of the defendant" and (3) "likely" to be "redressed by a favorable decision."  *Id.* at 560–61 (quotation marks and citations omitted); *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015).  In this posture, the Court must accept the factual allegations of the complaint as true, *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006), but also assess the "plausibility" of the plaintiff's standing allegations in light of the relevant context and the Court's "judicial experience and common sense," *Humane Soc'y of the U.S.*, 797 F.3d at 8 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

"Alternatively, a Rule 12(b)(1) motion may raise a 'factual' challenge to the Court's jurisdiction."  *Hale*, 2015 WL 7760161, at *3.  When a motion to dismiss is framed in this manner, the Court "may not deny the motion . . . merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant" but "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).  The Court "has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," so long as it "afford[s] the nonmoving party an ample opportunity to secure and present evidence relevant to the existence of jurisdiction."  *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984) (citations omitted).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *see* Fed. R. Civ. P. 12(b)(6).  In evaluating such a motion, the Court "must first tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 675, 678) (alterations in original).  The complaint need not include "detailed factual allegations," and a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).  The Court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Pro. Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record," *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

## III.  ANALYSIS

Defendants raise three sets of arguments.  First, they contend that Plaintiffs lack standing to assert claims against a subset of Defendants—namely, DHS, the Secretary of DHS, USCIS, the Director of USCIS, and the Secretary of State—because those departments and officials either lack a role in the visa-adjudication process or have completed their roles in the process. *Id.* at 11–12.  Second, Defendants maintain that Plaintiffs' unreasonable-delay claim is barred by the consular nonreviewability doctrine, and, in any event, that the delay in adjudicating Plaintiffs' visa applications is neither unlawful nor unreasonable.  *Id.* at 12–26.  And, third,

Defendants assert that the complaint fails to state a cognizable due process claim.  *Id.* at 27–28.

The Court will address each set of arguments in turn.

**A.**     **Standing**

Defendants first contend that DHS, the Secretary of DHS, USCIS, the Director of USCIS,

and the Secretary of State "should be dismissed because either they have no role in adjudicating

the applications or they completed their role in the process."  Dkt. 8 at 11.  Specifically,

Defendants point out that the "complaint concedes that [DHS] and its component, USCIS, have

completed their adjudication of the underlying visa petition," *id.* (citing Dkt. 1 at 6 (Compl.

¶ 17)), and they further argue that the Secretary of State cannot "adjudicate an application for a

visa" and lacks the authority to control consular officials' visa determinations.  *Id.* at 11–12.[2]

**1.**     *DHS and USCIS*

Defendants are correct that Plaintiffs lack standing to bring claims against DHS, USCIS,

and their respective heads.  "Redressability examines whether the relief sought, assuming that

the court chooses to grant it, will likely alleviate the particularized injury alleged by the

plaintiff."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996).  Here, the

particularized injury about which Plaintiffs complain is a delay in adjudicating their visa

petitions.  As a result, Plaintiffs have standing to proceed against each defendant only to the

extent that "an order from this Court compelling" that defendant to act on Plaintiffs' petitions

---

[2] In their motion, Defendants assert that the complaint "name[s] . . . the Department of State's Legal Advisor" as a defendant and argue that the Legal Advisor should also be dismissed because he or she lacks a role in the visa adjudication process.  Dkt. 8 at 11.  On this score, however, Defendants misread the complaint, which does not name the Legal Advisor as a defendant, *see* Dkt. 1 at 4–6 (Compl.), and instead merely specifies the "Office of the Legal Advisor" as the recipient of service on behalf of the State Department, *id.* at 1 (Compl.).

"would redress [Plaintiffs'] alleged injur[y]."  *Abulhawa v. U.S. Dep't of the Treasury*, 239 F.

Supp. 3d 24, 36 (D.D.C. 2017).

All agree that DHS and USCIS have completed their initial duties with respect to the

adjudication of Plaintiffs' visa petitions and that no action with respect to Plaintiffs' visas is

currently pending before either department.  *See* Dkt. 8 at 11; Dkt. 9 at 6 ("[USCIS], a

component of the Department of Homeland Security, concluded its processing of the underlying

petition on August 12, 2013.").  Rather, Plaintiffs' petitions are pending adjudication before

consular officials in the U.S. Embassy in Baghdad, and the Court is unaware of any mechanism

through which DHS or USCIS can exert authority over the timing of that process.  Thus, with

respect to USCIS, DHS, and the officials who lead them, there is no relief that the Court could

order that would remedy Plaintiffs' injury—that is, the *Embassy's* delay in adjudicating

Plaintiffs' visas.

Plaintiffs do not dispute these points.  Instead, they observe that, pursuant to State

Department regulations implementing the Immigration and Nationality Act ("INA"), USCIS

*could* have a further role to play with respect to Plaintiffs' visa applications, at a later stage in the

process, if the consular officer determines that she "has reason to believe" that Plaintiffs obtained

their petition approval through fraud, misrepresentation, or some unlawful means, or that

Plaintiffs are, "not entitled, for some other reason, to the status approved."  22 C.F.R. § 42.43;

*see* Dkt. 9 at 10.  Should this occur, then the applicable regulation requires the "consular officer

[to] suspend action in [the] petition case and return the petition, with a report of the facts, for

reconsideration by DHS."  22 C.F.R. § 42.43; *see* Dkt. 9 at 10.  As a result, it remains possible,

Plaintiffs argue, that DHS could have more work to do with respect to Plaintiffs' visa petitions.

Plaintiffs are correct that it is hypothetically possible for the consular official to return Plaintiffs' visas to DHS and USCIS for reconsideration, but that observation has little bearing on Plaintiffs' current standing to assert claims against DHS and USCIS.  What matters for purposes of standing is whether the Court could order DHS or USCIS to take some action, at present, that would remedy the delay in adjudication of Plaintiffs' visas, which is all that Plaintiffs currently challenge.  That is not possible here, however, where DHS and USCIS have completed their initial duties with respect to Plaintiffs' visa petitions and Plaintiffs' visas are now pending before the U.S. Embassy in Baghdad—a component of the State Department—and not DHS or USCIS.  To the extent that Plaintiffs seek to rest their claims on the hypothetical event that the Embassy might, at some future date, return Plaintiffs' petitions to DHS and USCIS for reconsideration pursuant to 22 C.F.R. § 42.43, that claim is not ripe.  *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.").  Accordingly, the Court concludes that Plaintiffs lack standing to pursue their unreasonable-delay claims against DHS and USCIS and will dismiss those claims for lack of jurisdiction.

2.      *Secretary of State*

Defendants also argue that Plaintiffs lack standing to pursue an unreasonable-delay claim against the Secretary of State.  They maintain that the INA precludes the Secretary of State from compelling further action on Plaintiffs' visa applications, and, thus, the Secretary cannot take any action that would redress Plaintiffs' injury.  Dkt. 8 at 12.  The Court is unpersuaded.

Defendants ground their argument in two D.C. Circuit cases—*Baan Rao Thai Restaurant v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021), and *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1156 (D.C. Cir. 1999)—which interpret the INA to "grant[] consular officers 'exclusive

9

authority to review applications for visas, precluding even the Secretary of State from controlling their determinations.'" *Baan Rao*, 985 F.3d at 1024 (quoting *Saavedra Bruno*, 197 F.3d at 1156). Neither case is helpful to Defendants. Control over a consular officer's visa *determinations*—that is, her decisions to "grant[], deny[,] [or] revok[e] . . . immigrant and non-immigrant visas," *Saavedra Bruno*, 197 F.3d at 1156—is not the same as control over the *timing* by which the consular officer considers the applications presented to her. No one disputes that the INA bars the Secretary of State from directing a particular *outcome* with respect to Plaintiffs' visa adjudications. But nothing in *Baan Rao* or *Saavedra Bruno* precludes the Secretary—who oversees the State Department (which Defendants have not moved to dismiss)—from directing consular officers "to conclude . . . matter[s] presented to [them]" "within a reasonable time," 5 U.S.C. § 555(b), and Defendants have identified no authority supporting such a defense. Accordingly, the Court will deny Defendants' motion with respect to the Secretary of State.

## B.      Consular Nonreviewability

That brings the Court to Defendants' second ground for dismissal—that the consular nonreviewability doctrine precludes judicial review in this case. Dkt. 8 at 12. As explained below, the Court concludes that the consular nonreviewability doctrine does not apply to this case because a consular officer has not rendered a final decision with respect to Plaintiffs' applications. In short, Plaintiffs do not ask that the Court review a decision rendered by a consular officer; they merely ask that the Court require the consular officer to render *a* decision—regardless of what that decision might be.

The consular nonreviewability doctrine "shields a consular official's decision to issue or withhold a visa from judicial review." *Baan Rao*, 985 F.3d at 1024; *see also Saavedra Bruno*, 197 F.3d at 1158 ("[C]onsular visa determinations are not subject to judicial review."); *United*

*States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (explaining that courts cannot

"review the determination of the political branch of the Government to exclude a given alien").

There is some disagreement among courts as to whether the consular nonreviewability

doctrine applies only to the review of a consular officer's substantive, final decision with respect

to a visa application or whether it also prevents courts from entertaining a suit that challenges

delays in the adjudication of a visa application before any final decision has been rendered.  On

one side of the ledger, a long line of decisions from this Court have held that the consular

nonreviewability doctrine applies only to final decisions and thus does not bar judicial review of

a consular officer's delay when a visa application has been provisionally refused pending a final

decision.  *See, e.g.*, *Ghadami v. U.S. Dep't. of Homeland Sec.,* No. 19-cv-397, 2020 WL

1308376, at *5 (D.D.C. Mar. 19, 2020) (declining to apply the consular nonreviewability

doctrine where an "application is still undergoing administrative processing, even where a

refusal has been relayed"); *Vulupala v. Barr*, 438 F. Supp. 3d 93, 98–99 (D.D.C. 2020) (same);

*P.K. v. Tillerson*, 302 F. Supp. 3d 1, 11 (D.D.C. 2018) ("[T]he doctrine of consular

[nonreviewability] does not apply where the government has not made a final visa decision.");

*Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the U.S. v. Kerry*, 168

F. Supp. 3d 268, 291–92 (D.D.C. 2016) (holding that the doctrine of consular non-reviewability

did not apply where plaintiffs' visa applications were not formally refused, but were held in

"administrative processing").  As support, many of these cases invoke the Ninth Circuit's

decision in *Patel v. Reno*, 134 F.3d 929 (9th Cir. 1997), which held that the consular

nonreviewability doctrine does not bar judicial review when a "suit challenges the authority of

[a] consul to take or fail to take an action as opposed to a decision taken within the consul's

discretion" and concluded that mandamus relief was appropriate to compel action on a visa

application that had only been "provisional[ly] refus[ed]" but as to which no final decision had been issued. 134 F.3d at 931–33.

On the other side of the ledger, several district court decisions within the Second Circuit have held that the consular nonreviewability doctrine bars suits to compel action on a delayed visa application. *See, e.g.*, *Al Naham v. U.S. Dep't of State*, No. 14-cv-9974, 2015 WL 3457448, at *3 (S.D.N.Y. June 1, 2015); *Saleh v. Holder*, 84 F. Supp. 3d 135, 139 (E.D.N.Y. 2014); *Li v. Chertoff*, No. 06-cv-13679, 2007 WL 541974, at *1 (S.D.N.Y. Feb. 16, 2007). These decisions ground their conclusion in a broad declaration by the Second Circuit that "the judiciary will not interfere with the visa-issuing *process*." *Wan Shih Hsieh v. Kiley*, 569 F.2d 1179, 1181 (2d Cir. 1978) (emphasis added).[3]

Despite these differing approaches, none of these cases joins issue with any of the conflicting decisions. After reviewing both lines of authority, several considerations persuade the Court that the decisions that hold that the consular nonreviewiability doctrine does not bar suits that merely seek to compel *some* agency action—regardless of the substance of that action—have the better view.

The doctrine of consular nonreviewability has both constitutional and statutory roots. It is premised in part on the inherently "political nature of visa determinations"—which touch on "policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government" that are "exclusively entrusted to the political branches of

---

[3] The circumstances in *Wan Shih Hsieh* are distinguishable from those present here. Notably, the consular action at issue in *Wan Shih Hsieh* was the suspension of visa processing for the plaintiff's children based on the consular officer's concerns that the plaintiff had fraudulently obtained an adjustment in her immigration status that then formed the basis for her children's visa petitions. 569 F.2d at 1181–82. Here, in contrast, the complaint does not allege that a consular officer has identified any substantive concerns with respect to Plaintiffs' visa applications but instead alleges that Plaintiffs' applications are still awaiting adjudication.

government"—and in part on "the lack of any statute expressly authorizing judicial review."

*Saavedra Bruno*, 197 F.3d at 1159.   Put differently, although "it may be 'error to suppose that

every case or controversy which touches foreign relations lies beyond judicial cognizance,' . . .

it is nevertheless 'not within the province of any court, unless expressly authorized by law, to

review the determination of the political branch of the Government to exclude a given alien.'"

*Id*. (first quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962), and then quoting *Knauff*, 338 U.S. at

543).   Thus, the doctrine's application to the visa-application process is derived in large part

from the INA's grant of broad discretion to consular officers to grant or deny applications for

visas.   *See id.* at 1158 ("The overriding consideration is the nature of consular visa decisions.").

The INA, for instance, provides only that a consular officer "may"—but not "must"—issue an

immigrant visa to "an immigrant who has made proper application therefor,"   8 U.S.C.

§ 1201(a)(1)(A), and it assigns this discretionary judgment to the "exclusive authority" of

consular officials, such that "even the Secretary of State" is precluded "from controlling their

determinations."   *Baan Rao*, 985 F.3d at 1024; *see* 8 U.S.C. § 1104(a); *see also Saavedra Bruno*,

197 F.3d at 1158 n.2 ("Consular officers have complete discretion over issuance and revocation

of visas.").   Taking its cue from Congress, the judiciary has interpreted this broad delegation of

discretion (and the corresponding lack of any specific provision authorizing judicial review) to

bar review of a consular official's decision to grant or deny a visa application to a given

individual.

    That does not resolve the question presented here, however.   Although these

constitutional and statutory principles explain why the consular nonreviewability doctrine applies

to a consular officer's *substantive* decisions to approve or deny a visa application, that same

reasoning does not extend to the *procedural* considerations at issue here.   In contrast to the

inherently political nature of decisions regarding who should (and should not) be admitted into the United States, the question whether a consular officer has engaged in unreasonable delay in considering an application is not "an area in which legislative action [and] traditional practice indicate that courts are unqualified or that issues are inappropriate for judicial determination," *Saavedra Bruno*, 197 F.3d at 1160 (quotation marks omitted).  Most significantly, considerations of this type implicate political considerations to a far lesser extent; the Court is not asked to exercise—or to second guess the Executive in exercising—the sovereign powers to exclude aliens or to protect "the country against foreign encroachments and dangers."  *Id.* at 1159 (quoting *The Chinese Exclusion Case*, 130 U.S. 581, 609 (1889)).  It is not asked to intercede in diplomatic disputes regarding the denial of visas.  *Id.* at 1159 & n.9.  Nor is the Court asked to opine on a matter committed to agency discretion or beyond the judicial ken.  *Id.* at 1160 & n.11. Plaintiffs do not request any such relief, and as the Supreme Court has recognized in the context of Section 706(1), where "an agency fail[s] to take a discrete agency action that it is required to take . . . a court can compel the agency to act [even though it] has no power to specify what th[at] action must be."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64–65 (2004).

A further consideration counsels in favor of judicial review.  Although the INA vests consular officers with significant discretion to render a substantive decision to grant or deny a visa, there is reason to doubt that it has given consular officials similarly wide discretion indefinitely to delay a decision on a visa application.  Section 222(b) of the INA, for instance, provides that "[a]ll immigrant visa applications *shall be reviewed* and *adjudicated* by a consular officer."  8 U.S.C. § 1202(b) (emphases added).  The State Department regulations concerning the processing of visa applications, moreover, require a consular official who is presented with a "properly completed and executed" immigrant visa application to take one of three actions: (1)

"issue the visa," (2) "refuse the visa under INA 212(a) or 221(g) or other applicable law," or (3) "discontinue granting the visa" pursuant to INA § 243(d).  22 C.F.R. § 42.81(a).  And, finally, a further regulation governs the "[s]uspension of action" on a petition for immediate relative status.  22 C.F.R. § 42.43.  That regulation provides that a consular officer presented with such a petition shall "suspend action in a petition case" (1) *if* the petitioner requests it or (2) "*if* the officer knows or has reason to believe that approval of the petition was obtained by fraud, misrepresentation, or other unlawful means, or that the beneficiary is not entitled, for some other reason, to the status approved."  *Id.* § 42.43(a) (emphasis added).  If the consular officer does suspend action in a petition case, moreover, the regulation directs that she must "return the petition, with a report of the facts, for reconsideration by DHS," *id.*, and, here, there is no indication that a consular officer has taken such an action with respect to Plaintiffs' petitions. Put together, these constitutional, statutory, and regulatory differences undercut Defendants' contention that the Court should extend the consular nonreviewability doctrine to cases, like this one, that steer clear of the substance of the decision whether to grant or deny an application for a visa and merely ask the Court to compel the agency to issue a decision—up or down—on a long-pending application.

The Court acknowledges the possibility that, on rare occasion, a delay in adjudicating a visa application or a group of visa applications might arise out of a broader national security or foreign affairs strategy by the Executive.  But, as the Supreme Court has cautioned, "it is error to suppose that every case or controversy which touches on foreign relations lies beyond judicial cognizance," *Baker*, 369 U.S. at 211—and that admonition applies with even greater force to cases that involve the exercise of an authority that might conceivably, in some other context, touch on foreign relations.  Nor, in any event, does the present motion to dismiss require the

Court to decide whether the consular nonreviewability doctrine might have some residual traction in cases that merely seek action—and not any particular action—on a long-pending application.  Here, Defendants address the merits and Plaintiffs' Section 706(1) claim and argue that "the delay here is due to reasonable and prudent measures to protect safety and health."  Dkt. 8 at 20.  They support that contention, moreover, by pointing to a statement on the Embassy's "public facing website," which states that "[a]s of January 1, 2020, all consular services are suspended at the U.S. Embassy in Baghdad, Iraq due to the attack on our facility" and that "[t]he COVID-19 pandemic continues to severely affect the ability of the embassies and consulates around the world to be able to resume routine visa services."  *Id.* (quoting *Visas*, U.S. Embassy & Consulates in Iraq, https://iq.usembassy.gov/visas (last visted July 27, 2022)).  To be sure, when turning to the merits, the Court will owe substantial deference to the Embassy's assessment of any ongoing security risk and the need to curtail operations in light of the pandemic.  But it would not unduly intrude on any core executive function for the Court to inquire—with that deference in mind—whether an attack that occurred over two-and-a-half years ago or a pandemic that is now in its third year still reasonably precludes the Embassy from processing visa applications that were filed years before the attack or pandemic.  The Court, in short, is capable of according the Executive Branch the deference that it is due on matters of national security and individual safety while still complying with its "virtually unflagging obligation . . . to exercise the jurisdiction given [to it]."  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

Defendants offer two arguments in response to this conclusion.  First, they acknowledge that several judges on this Court have "found jurisdiction to compel consular action" based on an unreasonable-delay claim, Dkt. 8 at 14, but they argue that the D.C. Circuit essentially overruled

those decisions in *Baan Rao*, when it declared that the consular nonreviewability doctrine "shields a consular official's decision to issue or *withhold* a visa from judicial review," 985 F.3d at 1024 (emphasis added).  Defendants seize on the D.C. Circuit's use of the word "withhold." They maintain that when the Embassy handed Plaintiffs a refusal sheet and referred their visa applications for further administrative processing, that counted as a decision to "withhold" visas from Plaintiffs, even if Plaintiffs might eventually receive a visa once processing is completed. Dkt. 8 at 13.

Linguists might reasonably debate the various meanings of the word "withhold," but Defendants place too much significance on the D.C. Circuit's word choice.  Although "withhold" can sometimes imply a passive or temporary state of affairs (thus, one who "refrain[s] from granting" an object for a time, without making any decision, can be said to be "withholding" it), the term may also be used as a synonym for more active, final terms, such as "deny," "decline," or "disallow."  *See, e.g.*, *Withhold*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/withhold.  As relevant here, the D.C. Circuit's decision in *Baan Rao* did not concern a temporary or passive refusal by a consular officer to issue a visa; rather, the plaintiffs in *Baan Rao* challenged a final consular decision to deny their applications on substantive grounds.  *See* 985 F.3d at 1023 ("[T]he Embassy *denied* [plaintiffs'] applications, concluding both did not meet all of the requirements of an E-2 essential employee as specified in [the Department of State's Foreign Affairs Manual]." (emphasis added) (second alteration in original) (quotation marks omitted)).  As a result, the *Baan Rao* court did not have occasion to consider whether a consular officer's passive inaction or temporary refusal of a visa pending administrative processing is reviewable.  Nothing in the *Baan Rao*, moreover, suggests that the

D.C. Circuit intended to make a sweeping statement—in *dicta* or otherwise—about the scope of the consular nonreviewability doctrine.  The D.C. Circuit simply decided the case before it.

Nor did *Baan Rao* articulate the test in a novel manner.  Twenty-three years ago, in *Saavedra Bruno v. Albright*, the D.C. Circuit similarly explained that the "doctrine holds that a consular official's decision to issue or *withhold* a visa is not subject to judicial review," 197 F.3d at 1159 (emphasis added).  But that case, notably, predates the long line of decisions from this Court that have held that the doctrine does not apply before a consular official has rendered a final decision with respect to a visa application.  *See, e.g.*, *Vulupala*, 438 F. Supp. 3d at 98–99; *P.K.*, 302 F. Supp. 3d at 11; *Nine Iraqi Allies*, 168 F. Supp. 3d at 291–92.  And just two sentences after *Saavedra Bruno* uses the word "withhold," it describes the doctrine again as precluding the "official review of a consular officer's *denial* of a visa."  197 F.3d at 1160 (emphasis added).  In short, the D.C. Circuit's use of the word "withhold" cannot carry the weight that Defendants ask it to bear.

Defendants' second argument fares no better.  Even if a consular officer's failure to finally adjudicate a visa petition is subject to judicial review, Defendants argue, in this case, a consular official rendered a final decision with respect to Plaintiffs' visa.  As Defendants point out, Plaintiffs have alleged that the State Department stated that the applications were "refused" pursuant to INA section 221(g).  Dkt. 8 at 14; *see* Dkt. 1 at 7, 8 (Compl. ¶¶ 21, 23).  And while Defendants concede that "additional processing might cause a consular officer to revisit or reconsider that refusal," they maintain that "a decision contemplated by the State Department's regulations has most certainly been made."  Dkt. 8 at 14 (citing 22 C.F.R. § 42.81(a)).

Section 221(g) of the INA provides:

No visa or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted

therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law, (2) the application fails to comply with the provisions of this chapter, or the regulations issued thereunder, or (3) the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law[.]

8 U.S.C. § 1201(g). This language, which merely establishes limits on the authority of a consular official to "issue" a visa, says nothing about whether, in "refusing" a visa pending "administrative processing," Defendants have rendered a final decision with respect to Plaintiffs' applications that is shielded by the consular nonreviewability doctrine.

To this end, Defendants further invoke 22 C.F.R. § 42.81, which sets forth the procedure for "refusing" an immigrant visa. That regulation provides, in part:

When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa.

22 C.F.R. § 42.81(a). Defendants maintain that the consular officials in Baghdad "refused" Plaintiffs' visas under Section 221(g), and that this refusal qualifies as a final decision. But, as other decisions from this Court have held, the State Department cannot elevate "form over substance," and thus the focus in a consular nonreviewability case must be "on what is actually happening." *Vulupala*, 438 F. Supp. 3d at 98. Although the State Department may "choose[] to *characterize* a section 221(g) notification as a 'refusal,'" *id.* (emphasis added), that magic word is not a get-out-of-review-free card. At the motion to dismiss stage, the Court must examine Plaintiffs' allegations to determine whether the complaint sufficiently alleges that the consular officer's "refusal" was in fact an "interim decision [that] is not sufficiently final to warrant the application of the [consular nonreviewability] doctrine." *Id.*; *see also Ramirez v. Blinken*, No. 21-cv-1099, 2022 WL 1795080, at *5 (D.D.C. Mar. 22, 2022) ("While a visa application must be

either granted or refused at an initial interview, that refusal is often not final.  Instead, a refusal

may be entered for 'administrative processing,' and applicants may have an opportunity to

provide additional information to establish eligibility."); *Carter v. U.S. Dep't of Homeland Sec.*,

No. 21-cv-422, 2021 WL 6062655, at *3 n.3 (D.D.C. Dec. 22, 2021) ("[R]efusals followed by

'administrative processing' are not 'final decisions.'").

　　　Here, the factual allegations in the complaint, taken as true at this stage in the

proceedings, indicate that no final decision has been made with respect to Plaintiffs' visa

applications.  Although a consular official interviewed Plaintiffs on October 3, 2016, and

nominally "refused" their visa application "under INA section 221(g)," Dkt. 1 at 7 (Compl.

¶¶ 20–21), Plaintiffs were also told at their interview that their "immigrant visa application[s]

need[] further administrative processing," *id.* (Compl. ¶ 20).  At that interview, Plaintiffs'

passports were retained by the Embassy, and Plaintiffs were "told that their passports would be

returned to them once the administrative processing was completed and their visas issued and

placed on their respective passports."  *Id.*  Since their interview, moreover, Plaintiffs have "made

multiple inquiries" regarding the status of their visa applications, only to be told that their "[v]isa

application[s] [were] refused . . . for administrative processing;" that "[n]o further action . . . is

required at this time;" and that the Embassy will "reach out" to Plaintiffs "when administrative

processing is complete."  *Id.* (Compl. ¶ 21).  These actions and notifications are inconsistent with

a final decision, and, indeed, the Embassy's retention of Plaintiffs' non-U.S. passports indicated

that the Embassy's "refusal" was merely provisional, with a final decision yet to come.[4]

---

[4] Although the Embassy eventually returned the passports at Plaintiffs' request to enable them to
travel internationally while they awaited a final decision on their visa applications, Dkt. 1 at 7
n.2 (Compl.), the fact that the Embassy held on to the passports in contemplation of affixing
Plaintiffs' approved visas to them at the same time that the Embassy purportedly "refused"

Accordingly, the Court concludes that Defendants have not reached a final decision with respect to Plaintiffs' visa applications, and, thus, the consular nonreviewability doctrine does not bar judicial review of Plaintiffs' claims.

## C.    Unreasonable Delay

Defendants argue in the alternative that, even if consular nonreviewability does not foreclose relief, the delay in adjudicating Plaintiffs' visa applications is not unreasonable.  Dkt. 8 at 16.  At this stage in the litigation, however, that argument is better suited for summary judgment, as Defendants must supply the Court with a record concerning the circumstances of Plaintiffs' visa adjudication and the conditions at the U.S. Embassy in Baghdad before the Court can gauge the reasonableness of Defendants' delay.  The Court, accordingly, will deny Defendants' motion to dismiss Plaintiffs' unreasonable-delay claim as to the Secretary of State, the State Department, the U.S. Ambassador to Iraq, and the U.S. Embassy in Iraq.

As a threshold matter, although Plaintiffs seek to compel a decision on their applications under both the APA and the Mandamus Act, for purposes of this inquiry those claims merge. The D.C. Circuit has made clear that, in cases challenging agency delay, "the standards for obtaining relief" under the Mandamus Act and the APA are "essentially the same." *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010).  "The central question in evaluating 'a claim of unreasonable delay' is 'whether the agency's delay is so egregious as to warrant mandamus.'" *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *Telecomm. Rsch. & Action Ctr. v. FCC (TRAC),* 750 F.2d 70, 79 (D.C. Cir. 1984)).

---

Plaintiffs' applications indicates that this initial refusal was merely a provisional, claims-processing action rather than a final decision on the merits.

To this end, the D.C Circuit considers six factors—known as the *TRAC* factors—in determining whether a delay in agency action is unreasonable:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 79–80 (internal quotation marks and citations omitted). These factors are not "ironclad" but offer "useful guidance." *Id.* at 80. That said, because of the nature of this inquiry, addressing an unreasonable delay claim is "ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003).

It is this final observation that spells trouble for Defendants at this stage in the proceedings. Because an analysis of the *TRAC* factors typically requires the court to wade through the particular facts and circumstances of an agency's delay, courts generally conclude that "undertaking such a fact-bound analysis at [the motion to dismiss] stage is premature." *Thomas v. Pompeo*, 438 F. Supp. 3d 35, 44 n.6 (D.D.C. 2020). Here, the Court lacks a sufficient basis to hold, at the motion to dismiss stage, that Plaintiffs have failed to state a plausible claim of unreasonable delay. A brief examination of some of the *TRAC* factors shows why.

The first and "most important factor is that the time agencies take to make decisions must be governed by a rule of reason." *In re Core Commc'ns*, 531 F.3d at 855 (internal quotation marks omitted). This rule of reason cannot be decided "in the abstract, by reference to some

number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee Wampanoag*, 336 F.3d at 1102.  As a result, Defendants must show an "identifiable rationale" governing their decisions.  *Xiaobing Liu v. Blinken*, 544 F. Supp. 3d 1, 11 (D.D.C. 2021) (quoting *Ctr. for Sci. in the Pub. Interest v. FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014)).

     Defendants insist that the Court may resolve Plaintiffs' unreasonable-delay claim on a motion to dismiss because the Court can take judicial notice of the only evidence it needs to resolve this case: the public-facing website of the U.S. Embassy in Baghdad.  *See* Dkt. 8 at 20. That website sets forth two bases for the delay in Plaintiffs' visa adjudication: (1) an "attack on [the] facility" that occurred on  January 1, 2020, which led "all consular services [to be] suspended at the U.S. Embassy in Baghdad, Iraq;" and (2) the COVID-19 pandemic, which, according to the site, "continues to severely affect the ability of embassies and consulates around the word to be able to resume routine visa services." *Visas*, U.S. Embassy & Consulates in Iraq, https://iq.usembassy.gov/visas (last accessed July 27, 2022).  Due to these two factors, the website informs applicants—like Plaintiffs—who interviewed "prior to December 31, 2019" and whose "application[s] w[ere] refused under Section 221(g) of the Immigration and Nationality Act pending the submission of additional documentation" to "continue to monitor the Embassy and Consulate websites . . . to see when [they] are able to return to normal operations."  *Id.*

     These representations, however, do not provide sufficient information for the Court to conclude, at the motion to dismiss stage, that Defendants' delay is based on a rule of reason.  For one, the January 1, 2020 attack on the Embassy occurred two-and-a-half years ago, and Defendants have not provided the Court with any evidence that would enable the Court to

understand whether that attack (or any other threat) continues to provide the basis for a suspension of the consideration of Plaintiffs' visa applications.  Defendants may eventually provide that evidence—but consideration of any such evidence is premature at the motion to dismiss stage.  Second, Defendants are correct that a few judges on this Court have relied heavily on the public health crisis posed by COVID-19 as a sufficient basis for dismissing an unreasonable-delay claim under the *TRAC* factors.  *See* Dkt. 8 at 17, 20 (citing *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 166 (D.D.C. 2021); and *Liu v. Blinken*, 544 F. Supp. 3d 1, 13 (D.D.C. 2021)).  These decisions may have been justified at earlier stages of the pandemic.  However, COVID-19 cannot excuse the suspension of consular services indefinitely, and, Defendants have not provided sufficient information to permit the Court to understand how pandemic conditions affect services at the Embassy at Baghdad specifically.  The plaintiffs in *Dastagir*, moreover, completed their interviews in March 2018, 557 F. Supp. 3d at 162, and the plaintiffs in *Liu* were not even eligible for an interview until March 2020, 544 F. Supp. 3d at 12.  Here, by contrast, Plaintiffs' applications had been pending for nearly three-and-a-half years before the beginning of the pandemic.

Turning to the third, fourth, and fifth *TRAC* factors, each of these requires an inquiry into the impact of the delay and the effect of granting relief to Plaintiffs on the agencies and other applicants.  The fourth factor requires the Court to consider the effect of granting relief on the agency's competing priorities, *TRAC*, 750 F.2d at 80, whereas the third and fifth *TRAC* factors analyze the "impact on human health and welfare and economic harm, and the nature and extent of the interests prejudiced by the delay," *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 118 (D.D.C. 2005).

In this case, while relief would be improper if it "would simply 'reorder' a queue of applicants seeking adjudication," the Court does not have before it any evidence indicating whether such a reordering would occur here. *Tate v. Pompeo*, 513 F. Supp. 3d 132, 149 (D.D.C. 2021) (quoting *Sarlak v. Pompeo*, No. 20-cv-35, 2020 WL 3082018, at *6 (D.D.C. June 10, 2020)). Defendants point to a series of decisions from within this circuit that have involved more detailed factual showings describing the queue of applications, their backlogs, and thus the challenges of granting relief. *See id.* at 150 (describing an "extraordinary backlog of visas" and citing to a government declaration attesting that the agency was "processing visas at less than 11 percent of normal capacity from July 15, 2020 to September 30, 2020, and processing nonimmigrant visa applications at less than 16 percent of normal capacity in November 2020"); *Liberty Fund*, 394 F. Supp. 2d at 116 (noting that the backlog of other pending applications was over 300,000); *Mashpee Wampanoag*, 336 F.3d at 1097 (noting that the queue operated on a "first-come" procedure); *Sarlak*, 2020 WL 3082018, at *6 (noting that 14,000 other applicants are awaiting similar adjudication on their own waiver requests). Several of these decisions rely on government declarations to establish the complexities of moving an applicant to the front of the application queue. At this preliminary stage in the proceedings, however, the Court lacks evidence of that nature. Defendants further assert that the Court is "ill-equipped to adjudge the appropriateness or necessity of COVID-19 restrictions" taken by the consulate, Dkt. 8 at 25, and that while the Plaintiffs live in constant fear of threats in Iraq, "advancing the applications here to the front of the queue would simply benefit Plaintiffs to the detriment of other noncitizens," *id.* at 17. But, again, these arguments are better suited to summary judgment, where the parties can present the Court with evidence concerning the operation of the Embassy's queue and the present health conditions that affect the Embassy.

D.      **Due Process**

Finally, Defendants move to dismiss Count Two of the complaint, which alleges that Defendants' delay in adjudicating their visa applications violates Plaintiffs' Fifth Amendment right to due process.  Dkt. 8 at 27–28; *see* Dkt. 1 at 12–13 (Compl. ¶¶ 43–46).  In their opposition, Plaintiffs appear to abandon this claim, which they do not mention.  But, in any event, the Court agrees with Defendants that Plaintiffs have failed to state a cognizable due process claim, and, accordingly, will grant Defendants' motion with respect to Count Two.

Although the complaint is not a picture of clarity, Plaintiffs appear to raise a procedural—as opposed to a substantive—due process claim.  They allege that Defendants' "combined delay and failure to act" violates their "right to fundamental fairness in administrative adjudication."  Dkt. 1 at 13 (Compl. ¶¶ 44, 46).  That claim fails.  The Supreme Court "long ago held that Congress is entitled to set the conditions for an alien's lawful entry into this country and that, as a result, an alien at the threshold of initial entry cannot claim any greater rights under the Due Process Clause."  *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1964 (2020).  As a result, the visa-application procedures cannot violate the Due Process Clause because "[w]hatever the procedure authorized by Congress is, it is due process."  *Knauff,* 338 U.S. at 544.  In other words, by assuring that Defendants comply with their statutory duties, the Court guarantees due process.  The Court, accordingly, will dismiss Count Two for failure to state a claim.

**CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that Defendants' motion to dismiss, Dkt. 8, is **GRANTED** in part and **DENIED** in part.  Defendants' motion to dismiss Count One is **GRANTED** with respect to claims against DHS, the Secretary of DHS, USCIS, and the Director of USCIS but is **DENIED** with respect to claims against the State Department, the Secretary of State, the U.S. Embassy in Iraq, and the U.S. Ambassador to Iraq.  Defendants' motion to dismiss Count Two is **GRANTED**.

   **SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: July 27, 2022